## PACIFIC POWER CO. v. SHEAFF. *

### (Circuit Court of Appeals, Ninth Circuit.  August 14, 1916.)

### No. 2603.

1. MASTER AND SERVANT ☞234(3)—CONTRIBUTORY NEGLIGENCE—HIGH-TENSION WIRES—PRESUMPTION OF KNOWLEDGE OF DANGER.

The law imputes no such knowledge of electricity to an electrician's helper that he is barred by contributory negligence from recovering for injury from high-tension electricity jumping to him from its conductor which he had nearly approached but had not touched.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 709; Dec. Dig. ☞234(3).]

2. MASTER AND SERVANT ☞119—MACHINERY AND PLACE TO WORK—ELECTRICAL APPARATUS.

Because of the tremendous potency and danger of electricity, an employer is held to extraordinary precaution for the safety of employés in the construction of machinery and appliances for its transmission.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 210; Dec. Dig. ☞119.]

3. MASTER AND SERVANT ☞280, 281(5)—ACTION BY SERVANT INJURED BY ELECTRICITY—EVIDENCE.

In action by employé for injuries from electric shock from defectively constructed lightning arrester near which he was put to work without warning, evidence that he had some electrical experience, but that, although he knew of danger of direct contact with a live wire, he did not know of danger that high-tension current would jump to a person approaching near it, that the lightning arrester was charged with a high current of electricity and its arms extended to within about 5 feet 9 inches of the ground, and that this height was improper and unsafe construction, supported verdict for plaintiff, as against claim of his assumption of risk and contributory negligence; a live wire not disclosing, by its appearance, its dangerous nature.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 981–986, 989; Dec. Dig. ☞280, 281(5).]

In Error to the District Court of the United States for the District of Nevada; E. S. Farrington, Judge.

Action by P. R. Sheaff against the Pacific Power Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Metson, Drew & MacKenzie, William M. Abbott, and William M. Cannon, all of San Francisco, Cal., and George A. Bartlett, of Reno, Nev., for plaintiff in error.

B. F. Curler, of Elko, Nev., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and RUDKIN, District Judge.

ROSS, Circuit Judge.  At the times in question the plaintiff in error, defendant below, was engaged in generating, selling, and distributing electricity in the state of Nevada and elsewhere, for power, light, and heat purposes, and the defendant in error, plaintiff below, was in its employ.  While so employed the plaintiff received very serious injuries, for which he sued the company, recovering in the trial

court a verdict and judgment. The case is brought here by the defendant, the contentions on its part being that the complaint does not state a cause of action, that the evidence does not sustain its material allegations, and that consequently the court below erred in denying its motions to direct a verdict in its behalf, and, further, that the plaintiff assumed the risks resulting in his injuries, and was also guilty of contributory negligence. Error is also assigned to the refusal of the court to give to the jury certain requested instructions.

After alleging the jurisdictional facts and stating the business in which the defendant company was engaged, the complaint alleges, in substance, that on a certain named day and for a period immediately prior and subsequent thereto, at its Nevada Hills substation near Fairview in Churchill county, Nev., the defendant negligently and recklessly, and without regard to the personal safety of its employés, including the plaintiff, constructed and maintained a certain electrical structure and equipment called a lightning arrester, to which were attached high potential primary wires, carrying electrical current in highly dangerous amount, to wit, about 60,000 volts on each of said primary wires, all of which was built and maintained in a defective manner and condition "in that high potential primary wires, and the wires, runs, arms and appliances, carrying and transmitting electrical currents and energy of high and dangerous amount and voltage, were not erected, built, and maintained at a safe and sufficient height and distance from the ground, but were built and maintained too near the ground and in too close proximity to the Nevada Hills station house or transformer station"; that on the day named the plaintiff was in the employ of the defendant as a laborer and electrician's helper, and was unfamiliar with the work of a journeyman lineman and electrician, and was unacquainted with and ignorant of the dangers incident to the work of a journeyman lineman and electrician upon or near wires or apparatus carrying electrical current of high voltage and potential energy; that on the day named the plaintiff was ordered to work in and around and near said lightning arrester and said Nevada Hills transformer house and substation, which place was a dangerous one in which to work by reason of the defects alleged, and by reason of the fact that the live arms of said lightning arrester were so near the ground and in so close proximity to said substation building, which dangers and dangerous condition were wholly unknown to the plaintiff; that on the day named the plaintiff, while working near and around said lightning arrester, as ordered by the defendant, "came either in such close proximity to or in contact with one of the said arms of said lightning arrester, whereupon a large amount of electrical current, to wit, 60,-000 volts, passed through the body of plaintiff to the ground, thereby inflicting upon plaintiff a violent electrical shock and severe and dangerous injuries," which injuries are specifically described in the complaint, and are alleged to have resulted in grievous pain and anguish and expense to him.

A demurrer filed by the defendant to the complaint being overruled, an answer was filed which, among other things, put in issue the allegations of the complaint in respect to the defective construction and

maintenance of the lightning arrester, and alleging that it was constructed and maintained in the proper and usual manner, and with due regard to the safety of the employés of the defendant, including the plaintiff, and was free from any defects as a whole or in any of its parts. The answer denied that the plaintiff was in the employ of the defendant as a laborer, but admitted that he was employed as an electrician's helper; it denied that the plaintiff was unfamiliar with the work of a journeyman lineman or electrician, and denied that he was ignorant of the dangers incident to the work of such an employé upon or near wires or apparatus carrying electrical current of high voltage or potential energy; it denied that the place where the plaintiff was set to work by the defendant was a dangerous place "excepting the ordinary danger surrounding all electrical apparatus or appliances," and denied that the plaintiff was ignorant of the dangers alleged in the complaint.

As affirmative defenses the defendant set up that the injuries received by the plaintiff were caused by his own carelessness and negligence in failing to exercise his natural faculties in a reasonable way to avoid injury, and that:

"All of the conditions surrounding the plaintiff at the time of the accident alleged in plaintiff's complaint, and all of the dangers and risks incident thereto, were open and explained to, and understood by, the plaintiff, and plaintiff had full knowledge thereof, and such dangers and risks were assumed by him as a part of his employment."

[1] We see no merit in the contention that the complaint does not state facts sufficient to constitute a cause of action. The action is based upon the ground that the place where the plaintiff was put to work was not a safe place, for the alleged reason that the lightning arrester was defectively constructed and maintained by the defendant in the particulars set out in the complaint, and as constructed and maintained was dangerous, of which dangers the plaintiff did not know and was not warned, and that in the course of his employment, in passing the live arms of the arrester, an electric current therefrom of tremendous voltage inflicted upon him the injuries for which he sued. It is difficult to see what more was necessary to constitute a cause of action. To sustain the argument of the plaintiff in error against the sufficiency of the complaint would be, in effect, to hold that "an electrician's helper" is bound to know as a matter of law that a high-power current of electricity is liable to jump from its conductor and pass through one who approaches too close to the conductor. We think it very clear that the law imputes no such knowledge to the "helper" of an electrician.

[2] Contributory negligence and assumption of risks are affirmative defenses, and they were set up by the defendant in its answer, as has been seen. Even in cases where the machinery and appliances about which an employé is put to work are of the ordinary kind, the employer is bound to use all reasonable care and prudence for the safety of those in his service, by providing machinery reasonably safe and suitable, and for failure in that precaution and care the employer is responsible for any injury which may happen through such defect,

which was or ought to have been known to him, and was unknown to the employé. Washington, etc., R. R. Co. v. McDade, 135 U. S. 554, 570, 10 Sup. Ct. 1044, 34 L. Ed. 235, and the numerous cases there cited. Manifestly far greater should be the precaution and care by the employer in the construction and maintenance of machinery and appliances for the transmission of a power of such tremendous potency and danger as electricity.

[3] It is also urged by the plaintiff in error that the evidence failed to prove the material allegations of the complaint, and therefore that the court should have granted the defendant's motion for a directed verdict in its behalf. It appears from the evidence that the plaintiff had been in the employ of the defendant company for several months prior to his injuries, digging holes and other such work part of the time, at the wage of $4 per day, part of the time as an electrician's helper at the same rate of pay, and part of the time as a lineman at $4.50 per day. The plaintiff in his testimony gave his trade as "steam stationary engineer," but he admitted that he had theretofore been employed in various occupations—at times running engines, operating steam boilers, electric dynamos and motors, blasting with dynamite, working in the construction of power lines and in the installation of transformers, etc. From his own testimony there can be no doubt that he knew better than to knowingly come in direct contact with a live wire or other conductor of electricity; but that fact by no means sustains the contention of the plaintiff in error that the court should have taken the case from the jury by directing a verdict in favor of the defendant.

The evidence shows that Fairview substation, where the accident happened, is on a hill near a mine to which the plaintiff in error furnished power, and that the latter at the same time had another substation some 16 or 17 miles distant, called Wonder station, where the plaintiff had worked under the company's electrician, Mr. Halpenny, who had charge of both stations. That in question consisted of a small building in which were three transformers and the switchboard, and on the outside of which was the lightning arrester, consisting of frame work so constructed that its three north arms, which were made of small pipe, were attached one to each of the three high-tensioned feed wires running into the transformer house, and consequently, when so attached, each of these three arms was charged with electricity whenever the feed wires were carrying a current. The lower end, or horn, as it is called in the record, of each live arm, came within about 5 feet 9 inches of the ground and 3½ feet from the transformer house. On the south side of the arrester, were three dead arms or pipes, corresponding to the three live arms on the opposite side. The dead arms nowhere came in contact with the live arms or near them, except at the gap where they were about 3¼ inches apart; the purpose of the lightning arrester being to receive and carry into the ground any excess of electricity on the high-tension wires that might occur from any cause.

At the time in question this lightning arrester had not been completed; the dead arms not being connected in any way with the

ground. Nevertheless, connection with the high-tension feed wires had been made, and in consequence the arrester, though incapable of performing its functions, was charged with the full voltage of electricity then on the high-tension wires, amounting to about 55,000 volts. It was to prepare for connecting the dead arms on the opposite side of the transformer building with the ground that the plaintiff was sent by Halpenny to the Fairview substation to dig a hole under each of the dead arms, into each of which holes he was to put a cement block that he took with him. To the blocks iron clamps were subsequently to be attached, and the dead arms then connected by wire with the ground, all of which work was, according to the evidence, to be done by Halpenny.

The testimony of the plaintiff tended to show, among other things, that he was ignorant of the dangers attending working around or in the vicinity of live wires, and did not know and was not told that there was any danger of an electric current jumping from the live arms of the arrester in question if approached too close, and in this respect his testimony finds some corroboration in the testimony of Mr. Halpenny, the company's electrician who sent him there. After testifying quite fully in regard to the work that the plaintiff did under him, both in respect to the building of the power lines and of the substations at Wonder and Fairview, including the placing of wires, he testified, among other things, as follows:

"When Mr. Sheaff was going toward a wire that was exposed I would say to him, 'Look out, Mr. Sheaff, that is hot,' or something like that. When he would be working in the neighborhood of any wire which he could not see, or when he appeared to forget the existence of, I would say, 'Look out, Bill, don't go too close,' or something of that nature. I had warned him on several occasions against different wires that were in the building. They were hot. He seemed to understand the situation that those wires were hot after the first warning. Before that, I would not say that he did not seem to know that the wires were hot. He seemed rather to forget that those wires were there, and that was the reason I warned him. During all the time Mr. Sheaff was working under me, I did all the directing and supervision. I told Mr. Sheaff what to do and what not to do. The day that I sent him to Fairview, I told him that day just what to do. I told him to dig those holes and set those blocks. He dug the holes, and that was part of what I told him to do. Even up to that time I had directed him and supervised all the work that he had done; and up to that time he had continually been under my immediate supervision. He had been away from me to do work by himself. He built the line himself. That was something like three-eighths of a mile from me, I believe. That was working absolutely on dead wires. I at that time considered him an electrician's helper. This was not the first time that Mr. Sheaff was sent out by me from where I was to work in the vicinity of live wires. He had been sent to each of the two stations, Fairview and Wonder. That is the first time I ever sent him 12 miles away, as far as that. Before that, I had never sent him any great distance to work around live wires. We never had anything to do with the wires when they were alive at that high voltage. We worked around the lower voltage wires—6,600 volts. I knew the dangers attending this apparatus at Fairview before I sent Mr. Sheaff there. I knew what would happen to him if he came in contact with one of those live arms. I instructed him before I sent him to keep away from those. I told him not to touch any of the connections, or make any changes. By 'touch the connections' I meant not to touch any of the parts of the arrester itself. That meant he was not to touch any of the live parts or connections, and the parts on the arrester, meaning by that the horns. By 'touching the connections' I meant not to touch any of the live parts.

"Mr. Gedney: Q. Why did you say, 'Don't touch any of those live parts,' or, 'Don't touch any of those other parts'? A. Well, I will explain it in this way: That at the time of sending a man to do a piece of work, after he has done similar pieces of work, and worked in the vicinity of wires, you naturally make an assumption that he knows by previous experience what he should do in the way of safeguarding himself.

"Witness (continuing): I assumed that he knew the danger there, and that was the reason I didn't instruct him. I knew what experience Mr. Sheaff had had under me dealing with live wires at the time I sent him over there. I knew how this machine could become dangerous. I know how high those arms were off the ground, and I knew if a man came in contact with them what the result would be. I didn't have him make those connections because I wanted to attend to that myself. It wasn't because Mr. Sheaff wasn't competent to do it in my estimation. The reason I did not instruct Mr. Sheaff to do it was because I wished to wait until I got over there, and make arrangements for a shutdown long enough to work on this. * * * I didn't know 24 hours before Mr. Sheaff went over there that he was going over there to make that connection, or do that work. It took him about half a day to make those blocks for that Fairview substation. That was some time before the day he went over there. We knew we were going some time. I think it is not a fact that Mr. Sheaff and I were going together over there that morning. The reason I remained was because I was waiting for some bushings and tape that come in that night. That was the night Mr. Sheaff left there in the morning. It was not my intention to go over there that morning, with Mr. Sheaff. The opportunity presented itself for him to go that night, or early in the morning, because of the coming over of an extra wagon, as I remember, a stage running—this was not the regular stage, as I recall it now; it was an extra trip the stage driver had made; and since the material arrived that night, the material that I was waiting to use myself, and the opportunity for sending these blocks over presented itself, I sent the blocks over, and sent Mr. Sheaff over to put them in, thinking that it would hasten matters that much. I first informed Mr. Sheaff that evening that he was going over to Fairview that morning. There had not been any talk about it that I remember before that time."

The plaintiff testified, among other things, that when he got to Fairview substation, he got the key to the building from a man at the mine, opened the door, and took out a pick and shovel with which to dig the holes, went around to the southerly side of the structure (on which side were the dead arms), loosened the wires of the wire fence that had been built to surround it, dug the three holes under the three dead arms of the arrester, and then started around to the north side of the building to get the cement blocks to put in the holes. When passing one of the live arms the high-power voltage of electricity left it and passed through his body, inflicting the terrible injuries upon him described in the complaint. There was evidence tending to show that he did not actually touch the live arm, but in the nature of things he must have passed sufficiently close to it to attract the current; and there was positive testimony that such a voltage would jump at least 1¾ inches from its conveyor. The evidence is that the plaintiff was a little over 6 feet 3 inches in height, and that the arms of the arrester at the Fairview substation extended down to within about 5 feet 9 inches of the ground. There is evidence in the record tending to show that such a construction of a lightning arrester is proper, but there is also evidence tending to show the contrary, and that it is highly dangerous, as is shown very clearly by the injury inflicted in this instance. For example, the witness Scrugham, sworn on behalf of the plaintiff, and who testified that he is an electrical

engineer and professor of electrical engineering in the University of the State of Nevada, a graduate in that profession of the University of Michigan, and of many years' experience as technical expert for a number of named companies, testified, among other things:

"If the Pacific Power Company was carrying 55,000 volts of electricity, I would say it was a high-tension power line. Anything over 550 volts is considered a high-tension power line. We would call this, perhaps, an extra high-tension line. The usual and ordinary practice in high-tension construction with reference to the height that the live ends connected with that construction are from the ground should be well out of reach of a man working underneath it; that would be 10 feet approximately. The usual practice is to have it—a 60,000 volt line, approximately is about 4-foot clearance. If the amount of voltage between two of the high-tension wires of the Pacific Power line on July 18, 1911, was approximately 55,000 volts, if the system were a ground neutral system, as described by Mr. Halpenny, there would be approximately 32,000 or 33,000 volts. The voltage on a line is the pressure, the electricity corresponding to the pressure of a water pipe line or head of water. The amperes is the electrical current flowing in the line, corresponding to cubic feet of water per second, or gallons of water per second. Electricity would jump, say, from a point on the live arm of the arrester, No. 1, to a person, under normal conditions, on a line carrying 55,000 volts; if it is a grounded neutral, the same condition as prevailed on the Pacific Power Company line, it would jump about an inch and three-quarters under normal conditions. From this point (indicating on model) the amount of voltage between that and the ground would be from 32,000 to 33,000 volts. This inch and three-quarters is based on a voltage, not of 55,000, but of 33,000, volts between that point on the arrester and the ground. I am familiar with lightning arresters. I have measured this model. I am familiar with what is known as the horn-type arrester. Nearly all of the lightning arresters are based more or less on the horn-gap principle; at least a large part of them in use in the West. We use something similar in the Elka plant; something similar in use in the Truckee River plant, may not be the same in form, but some qualification of the horn gap; that is, on the high-tension side. I have seen almost exactly this arrester at Tonopah. The usual and customary height that the live arms of the arrester are put from the ground is at least 9 or 10 feet. They are put that height from the ground for the purpose of safety to human life.

"Mr. Curler: Q. Basing your answer upon your technical knowledge and experience, state whether or not a lightning arrester within 5 feet 9 inches of the ground is a safe construction. * * * A. I do not regard it as a safe construction."

The record contains much more testimony on this subject; and, while it is decidedly conflicting, it is hardly necessary to say that all such conflicts were for the determination of the jury. Enough has been stated to show that the jury was clearly justified in concluding that the arrester in question was constructed in a defective and dangerous manner, in that it reached to within about 5 feet 9 inches of the ground, and that the defendant was guilty of negligence in so constructing and maintaining it. We must therefore affirm the judgment unless we can properly hold that the further findings, necessarily involved in the verdict, that the plaintiff did not assume the risks to which the defendant's negligence subjected him, and was not guilty of such contributory negligence as precluded his recovery, were not justified by the evidence, or unless there was reversible error in the matter of the instructions of the court given or refused.

The testimony of the plaintiff and of the defendant's witness Halpenny is, we think, amply sufficient to sustain the conclusion of the

jury that the plaintiff did not assume the risks to which he was subjected, for not only did the plaintiff testify that he did not know and never was told that a current of electricity would jump from its wire or other conductor to and pass through a man who approached it too closely, but the jury might well have concluded from Halpenny's testimony above quoted that the plaintiff had no such knowledge, and was by no means familiar with the dangers attending work around or about high-tension wires or pipes, extending so near the ground as to admit the current of electricity leaving them and passing to and through a human being who should touch or approach too close to the conveyor; for in that portion of Halpenny's testimony he expressly says:

"I knew the dangers attending this apparatus at Fairview before I sent Mr. Sheaff. there. I knew what would happen to him if he came in contact with one of those live arms. I instructed him before I sent him to keep away from those. I told him not to touch any of the connections or make any changes. By 'touch the connections' I meant not to touch any of the parts of the arrester itself. That meant he was not to touch any of the live parts or connections, and the parts on the arrester, meaning by that the horns. By 'touching the connections' I meant not to touch any of the live parts.

"Mr. Gedney: Q. Why did you say, 'Don't touch any of those live parts,' or, 'Don't touch any of those other parts'? A. Well, I will explain it in this way: That at the time of sending a man to do a piece of work, after he has done similar pieces of work, and worked in the vicinity of wires, you naturally make an assumption that he knows by previous experience what he should do in the way of safeguarding himself. I assumed that he knew the danger there, and that was the reason I didn't instruct him. I knew what experience Mr. Sheaff had had under me dealing with live wires at the time I sent him over there. I knew how this machine could become dangerous. I know how high those arms were off the ground, and I knew if a man came in contact with them, what the result would be. I didn't have him make those connections because I wanted to attend to that myself. It wasn't because Mr. Sheaff wasn't competent to do it in my estimation. The reason I did not instruct Mr. Sheaff to do it was because I wished to wait until I got over there, and make arrangements for a shutdown long enough to work on this."

Not only does the foregoing testimony of Halpenny strongly tend, in our opinion, to corroborate the testimony of the plaintiff to the effect that he did not know the dangers to which he was subjected in carrying out his instructions, but nowhere in Halpenny's testimony does he state that he ever told the plaintiff that it was dangerous to pass close to the live arms of the arrester even if he did not touch them. Moreover, the witness Campbell, who appears to have had much experience with electricity and helped build the arrester in question, testified that he called Halpenny's attention to the great danger attending the extension of the arms of the arrester so close to the ground, and there is also testimony tending to show an admission of Halpenny to the effect that after sending the plaintiff to do the work in question, he thought he ought not to have done so. While it is undoubtedly well settled that an employé assumes the ordinary risks incident to his employment and also such extraordinary dangers as he knows and appreciates, and, knowing and appreciating them, yet undertakes the work for an agreed compensation, we think it is too plain for discussion that the evidence in this case was not insufficient to support the verdict of the jury to the effect that the plaintiff

did not assume the risks to which the evidence shows that he was subjected.

We think it also clear that we would not be justified in holding the evidence insufficient to support the finding of the jury that the plaintiff was not guilty of contributory negligence. It is true that it appears that he had helped Halpenny in the construction of the Wonder substation, including the digging of holes under its dead arms and the placing in them of similar cement blocks; but the evidence shows that the arms of that arrester were placed several feet higher from the ground than those at the Fairview substation, and besides it does not appear that the arrester at the Wonder station was connected with the high-tension wires at any time prior to the digging of the holes. The evidence shows that just the reverse occurred in the present case. Here, as has been pointed out, the arms of the arrester were extended so close to the ground as to make the live arms highly dangerous, according to the testimony of at least one expert witness, and they were connected with the high-power lines before and at the time the plaintiff was sent to do the work referred to. It is true that a danger sign was posted on the door of the transformer building, and it seems that a similar notice was posted on a post of the structure, but it is not pretended that either sign contained any notice that there was any danger of the current of electricity jumping from a live arm to a person only passing it, even if very close. There is nothing in the evidence indicating that the plaintiff voluntarily, or even carelessly, came into actual contact with either of the live arms; on the contrary, the bubble shown by the evidence on the lower end of the arm from which the plaintiff received the shock indicates that the current leaped to him, and, as said by the trial court, the nature and location of the injuries on the plaintiff's person, as shown by the evidence, tended to corroborate that theory.

We also agree with the court below that:

"Cases of this kind differ from those which have been cited where the danger was open and apparent to one in the exercise of his ordinary senses. A live wire or a live pipe, such as we have in this case, is not like an opening in a floor or a rapidly revolving wheel, which people may see and avoid. A live wire is quite as innocent in appearance as a dead one; it gives no warning before it deals the fatal shock."

We have examined the charge of the court with care, and are of the opinion that it was quite as favorable to the defendant as it should have been, and that such portions of the instructions requested and refused as stated the law were sufficiently covered by the charge. Indeed, in the concluding portion of the reply brief of the plaintiff in error it is said:

"Although we consider that in the particulars mentioned in our opening brief the court erred in its instructions to the jury, we nevertheless feel that if the jury had followed the court's instructions, even as given, the verdict must have been for the plaintiff in error."

The judgment is affirmed.